IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

UNITED STATES OF AMERICA


                vs.                 Criminal Action No. 9-22E

DONALD CATES

                    Defendant
_____


PROCEEDINGS

     Transcript of SUPPRESSION HEARING commencing on
WEDNESDAY, MARCH 24, 2010, United States District Court, ERIE,
Pennsylvania, before Honorable MAURICE B. COHILL, Senior U.S.
District Judge.


APPEARANCES:

For the Government:     UNITED STATES ATTORNEY'S OFFICE
                        BY:  CHRISTIAN TRABOLD, ESQ.


For the Defendant:     ARTHUR G. TRAKAS, ESQ.



                        Reported by:
                        Patricia Sherman
                        Official Court Reporter
                        Room 5380 USPO & Courthouse
                        Pittsburgh, Pennsylvania 15219
                        (412) 281-6855

Proceedings recorded by mechanical stenography.  Transcript
produced by computer-aided transcription.

1                           I N D E X

2

| GOVERNMENT WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Kenneth Kennedy | 3 | 10 | -- | -- |
| Jimmy D. Caudle, Jr. | 16 | 39 | 49 | -- |
| DEFENDANT WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |

7

8

9

10

11                       * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE COURT:  Good morning.

This is a hearing to consider a motion from the defendant to have certain statements that he made to FBI agents suppressed.

I think we can start with whomever you want to call. I suppose you'll be starting, Mr. Trabold.

MR. TRABOLD:  Yes, Your Honor.

The government calls Officer Kenneth Kennedy.

THE COURT:  Would you come forward and be sworn, please.

* * * * *

KENNETH KENNEDY, a witness, having been first duly sworn, testified as follows:

THE WITNESS:  Yes.

THE COURT:  Have a seat up here, please.  Give us your name and spell your last name.

THE WITNESS:  Officer Kenneth Kennedy, K-E-N-N-E-D-Y.

DIRECT EXAMINATION

BY MR. TRABOLD:

Q    Sir, where do you work?

A    Clarksville Police Department, patrolman.

Q    Where is Clarksville?

A    Clarksville is approximately an hour in from,

1   approximately an hour from Ft. Smith.

2           THE COURT:  Arkansas?

3           THE WITNESS:  Yes.

4   BY MR. TRABOLD:

5   Q    How long have you worked there?

6   A    Three years for Clarksville Police Department.

7   Q    Were you working on April 16 of 2009?

8   A    Yes, I was.

9   Q    Sometime around, let's say, approximately five o'clock,

10  did you encounter two people that appeared to be hitchhiking?

11  A    Yes, I did.

12  Q    Can you explain to the Court the circumstances of how you

13  first encountered those two people?

14  A    The dispatch advised that they got a complaint of two

15  young-looking subjects at the 55 exit westbound, sitting on a

16  guardrail, and thought they needed to be checked out.

17          THE COURT:  Is this on an interstate highway?

18          THE WITNESS:  Yes, sir.  It is I40.

19  BY MR. TRABOLD:

20  Q    You received a dispatch that there were two people

21  sitting on the guardrail to the 55 exit?

22  A    Yes.

23  Q    What did you do in response to that dispatch?

24  A    I went to the call.  Arrived on the scene.  Observed the

25  two subjects sitting there, two young-looking juveniles.

1    Asked them what they were doing, what their destination was,
2    where they were going, and their names to find out if there
3    was anything wrong, maybe runaways or needed help, anything of
4    that nature.
5    Q    What happened then?
6    A    I spoke to the male.  He gave me a name.  Asked him where
7    they was going.  Checked that.  Spoke to the female.  Got a
8    name, date of birth.  Ran it through dispatch.  They was
9    unable to give me any return showing anything on file for
10   them.
11   Q    Is there a particular reason that you would have been
12   asked to look into these two hitchhikers?  Is that something
13   you would normally do?
14   A    Due to the age of them, yes, being juveniles, to make
15   sure that they weren't runaways or anything of that nature.
16   Safety issue.
17   Q    Now, after you get their name and you ran their names,
18   what happens after that?
19   A    I got no return.  I asked, again, did you give me the
20   correct names, date of births.  The man said -- he gave me
21   another name and date of birth.  I started checking that.
22   Q    Wait.  The male that was there gave you one name.  You
23   ran that and checked that, and then after that, he gave you
24   another name?
25   A    Because I couldn't get no return, asked him if he went by

1  any other names, date of birth, seeing to make sure I didn't
2  get nothing wrong, yes.

3  Q    Then what happened?

4  A    I got no return on the second.

5         Asked the female, just making casual conversation,
6  nervous responses.  I separated them.  Still asking them
7  information.  A game and fish officer also pulled over to
8  assist me, make sure everything was fine.

9         I don't know how far into it, he was speaking to the
10  male, I had the female step back behind the patrol car to ask
11  her if there is anything wrong.  Anything she wanted to tell
12  me.  She was acting nervous.  She told me there was something
13  wrong.

14         Back and forth a couple times, the male gave me
15  another name, a third name.  I checked it.  Got nothing.  In
16  that conversation somewhere, he advised me that he had some
17  knives on him.  So, I did an officer safety pat, removed the
18  knives from him.  A fanny pack on him that it actually had a
19  Montana ID.  Ran that through dispatch by the number.

20  Q    So, you ran the Montana ID to see if there were any
21  warrants or anything?

22  A    That's correct.

23  Q    Any information at all?

24  A    Yes.

25  Q    What did that come back?

1   A    It came back that he was wanted.

2   Q    In what state?

3   A    I want to say Montana.  Best I recall.

4   Q    Once you were made aware of the fact that the person that

5   was there with you was wanted in the State of Montana, what

6   actions did you then take?

7   A    I handed a set of my handcuffs -- I told Officer Tucker,

8   I said, handed him those, put him in handcuffs, and told him

9   to place him in custody.

10          And I was still had my attention toward the female.

11  I heard him say -- I heard Officer Tucker say, don't do that.

12  I looked over and he was struggling with him.  I went over,

13  helped detain him.  He tried to get over a guardrail to take

14  off down an embankment.  We got him placed in cuffs and

15  brought back up to the car.

16  Q    Ultimately, that person, you were able to identify him as

17  Donald Cates?

18  A    Yes, sir.

19  Q    You placed him into a patrol car.

20          Then what happened to the girl?

21  A    There was several other officers. I did advise dispatch

22  that he was trying to run, and so, several other officers

23  showed up on the scene.

24          I believe Officer Clark placed her in his patrol car

25  and I had Mr. Cates in my patrol car.  He was taken back to

1    the detention center.

2    Q    Did Mr. Cates ever actually provide you his real name,

3    the name that matched the Montana license?

4    A    No, sir.

5    Q    You got that name from his license?

6    A    From the identification, yes, sir.

7    Q    That name was different -- the name on the Montana

8    license plate, that's different than the two previous names he

9    had provided to you?

10   A    Two or three, yes, sir.

11   Q    Now, when you got Mr. Cates in the patrol car, did he say

12   anything about the girl, or what's going to happen to the

13   girl, or make any reference to her at all that you can recall?

14   A    Only thing that was mentioned was, on the way back, he

15   had mentioned that he had been in trouble, had some bad

16   run-ins with the officers.  No one would believe him on stuff

17   he had, the sexual assault charges.

18   Q    Back in Montana you mean?

19   A    Yes.  That's what I took it to be.

20   Q    Now, was this stuff he volunteered to you or were you

21   trying to question him at that point?

22   A    He just answered.  I didn't question him.  No, he wasn't

23   being questioned during that point of time.

24   Q    Did he, during that point in time while you transported

25   him, make any reference to having an attorney or give you any

1  attorney name?

2  A    Just telling me that he had been in some trouble with the

3  law back in that area.  So, no.

4  Q    You don't recall him saying anything about an attorney or

5  telling you his name or anything like that?

6  A    No, I don't recall that.

7  Q    How long a period of time was it from the time you

8  initially got your dispatch until the time you began to

9  transport Donald Cates in your vehicle, roughly?

10  A    From the time I arrived on the scene until I took him

11  back to the DC, 15, 20 minutes.

12  Q    So relative quick period of time?

13  A    Yes.

14  Q    And the girl that was there, were you ultimately able to

15  identify her and figure out what was going on with her?

16  A    Yes, she did give me her correct name.

17  Q    She told you that she was a runaway?

18  A    Yes.  She did tell me herself she was a runaway.

19  Q    Did you then transport Mr. Cates somewhere?

20  A    I did.  To Johnson County Detention Center.

21  Q    How far away was that approximately from where you placed

22  him under arrest?

23  A    We were at 55.  I had to go to the 58 exit back east.

24  Approximately three miles.

25  Q    Then you brought him there and they took over from there,

1   the folks at the Johnson City Detention?

2   A    Yes.

3   Q    Your contact with Mr. Cates would have lasted for roughly

4   how long?

5   A    Three to five minutes. That's total from the vehicle

6   back to the detention center.

7   Q    Did Mr. Cates, when you were in his presence, seem to you

8   like he did not know what was going on in?

9   A    No, he talked to me as plain conversation as you and me

10   would talk.

11   Q    Did you have any trouble understanding what he was

12   saying?

13   A    No, sir.

14   Q    Did he appear to be under the influence of drugs or

15   alcohol?

16   A    No, sir. Made no mention of it.

17   Q    Did he appear to you to be injured in any way?

18   A    No, sir.

19   Q    Did he mention to you that he was injured?

20   A    No, sir.

21          MR. TRABOLD: Nothing further, Your Honor.

22          THE COURT: Cross examination.

23                  CROSS EXAMINATION

24   BY MR. TRAKAS:

25   Q    Good morning, Your Honor.

1          Officer Kennedy good morning.

2          Officer Kennedy, I notice you're reading off notes;

3    am I correct?

4    A    Yes, sir.

5    Q    Can you tell the Court what you're reading off of?

6    A    This is my initial report from the incident.

7    Q    When did you make that report?

8    A    The day of the incident.

9    Q    The entire relationship you had with Mr. Cates that day

10   lasted about 35 minutes from what I understand.

11         When did you write those notes?

12   A    After I got him taken to the detention center, I go back

13   to the police department and get all my information and try to

14   do an initial report.

15   Q    Where do you keep those notes?

16   A    They are on a computer.  I mean -- oh, the notes.  A lot

17   of it is -- I try to write on, I usually try to write on a

18   little piece of paper, something just to read back to the

19   dispatch.

20         Other than that, I just try to do it off memory.

21   Q    Do you maintain those notes continuously?  Do you keep

22   your notes?

23   A    Do I keep my notes?  No.  It's usually only a scribble

24   piece of paper.

25   Q    The document --

1  A     Yes.  These are kept, yes, sir.

2  Q     Where are they generated?

3  A     From the police department.

4  Q     Do they reflect the notes that you reported that day?

5  A     They go on a log.  Anything that I give to dispatch goes

6  on a log.

7  Q     So, you don't put them in.  Someone else puts them in; am

8  I correct?

9  A     Yes.

10  Q     You tell someone else.  They put them in.

11  A     If I read something back, yes.  If I use the radio, yes.

12  Q     Who else has access to that computer?

13  A     Police department in general.

14  Q     Many people?

15  A     All the other officers.

16  Q     Is there any code of any sort that is imputed into the

17  computer indicating those are your notes taken on that day?

18  A     I punch in my passwords and stuff and it shows -- brings

19  up my information that I do.

20  Q     Do your notes reflect, generally, everything that took

21  place within that 35-minute period that you were in contact

22  with Mr. Cates?

23  A     Best I recall, yes, sir.

24  Q     There came a point where you made a determination to

25  place Mr. Cates under arrest; am I correct?

1   A   Yes, sir.

2   Q   Then you placed him in the automobile?

3   A   Yes, sir.

4   Q   I assume in the back of the automobile?

5   A   Yes, sir.

6   Q   Did there come a time where he began to speak with you?

7   A   Yes, sir.

8   Q   You began to speak with him?

9   A   Yes, sir.

10  Q   Did there come a time where you Mirandized him?

11  A   I did not Mirandize him.  I wasn't questioning him.

12  Q   Did you tell him any of the guidelines of Miranda ever?

13  A   No.

14  Q   Not at all?

15  A   No.

16  Q   But you continued to have a conversation with him in the

17  automobile?

18  A   Conversation that he initiated, yes, sir.

19  Q   Did there come a time -- withdrawn.

20          Did there come a time when you became aware that

21  Mr. Cates had an attorney?

22  A   No, other than him telling me he had problems in another

23  state for the assault charges that he had.

24          The only other time is someone had said something

25  about it during that -- that may have been during the

1  questioning of prior to him having an attorney, but he never

2  told me he had an attorney or wished to speak to one.

3  Q    You never told him he had a right to one?

4  A    No, I had no reason to.  I didn't question him.

5  Q    How did Agent Caudle come into the equation?

6  A    They were notified in reference to what was going on, I

7  guess, about the warrants.

8  Q    When you say they were notified, help me.

9  A    Dispatch, when we get a hit on somebody in the system,

10  showing that they have a warrant, he had a hit to that

11  department, and then the proper authorities are notified.

12  Q    Did there come a time where you, Mr. Cates and

13  Mr. Caudle, Agent Caudle, were in the same place at the same

14  time?

15  A    Yes.

16  Q    That would be at the detention center in Johnson City?

17  A    Yes.

18  Q    That would be in the interrogation room?

19  A    Yes.

20  Q    Were you in there the entire time that Agent Caudle

21  interviewed Mr. Cates?

22  A    No, sir.

23  Q    How long after Agent Caudle got there did you stay?  How

24  long did you stay for?

25  A    Inside the room?

1  Q    Yes.

2  A    A few minutes.

3  Q    Were you privy to any conversation between Mr. Cates and

4  Agent Caudle?

5  A    Not that I recall, no.

6  Q    Your notes reflect anything that you recall?

7  A    No.

8  Q    Did Mr. Cates ever indicate to you that he was

9  represented by an attorney?

10 A    No.

11 Q    When he was freely elaborating about other issues that

12 had taken place in his life, did you ask him if he had an

13 attorney?

14 A    No.

15 Q    Is it your policy to Mirandize somebody after you arrest

16 them irrespective of whether or not they speak with you?

17 A    Only if I'm questioning them in reference to it.

18 Q    You don't routinely arrest somebody and then Mirandize

19 them?

20 A    No.

21           MR. TRAKAS:  I have no more questions, Your Honor.

22           MR. TRABOLD:  Nothing further.

23           THE COURT:  Thank you, Officer.

24           MR. TRABOLD:  The government calls FBI Special Agent

25 Caudle.

1                    * * * * *

2          JIMMY D. CAUDLE, JR., a witness, having been first

3    duly sworn, testified as follows:

4               THE WITNESS:  Yes, ma'am, I do.

5               THE COURT:  Have a seat please.  Give us your name

6    and spell your last name.

7               THE WITNESS: Jimmy D. Caudle, Jr. C-A-U-D-L-E.

8               THE COURT:  I didn't get it.

9               THE WITNESS:  C-A-U-D-L-E.

10                        DIRECT EXAMINATION

11   BY MR. TRABOLD:

12   Q    Sir, where do you work?

13   A    I'm a special agent with the Federal Bureau of

14   Investigation based out of Little Rock division in the

15   Ft. Smith resident agency, Ft. Smith, Arkansas.

16   Q    How long have you been an FBI agent?

17   A    Approximately 20 years now.

18   Q    Do you have some experience investigating what the FBI

19   calls generally child exploitation cases?

20   A    Yes, sir, I do.

21   Q    Now, just can you give the Court, since obviously this

22   occurred -- the incident you're here to talk about occurred in

23   Arkansas and we're up here in Erie.  Can you give the Court

24   some understanding of the distance from where your offices and

25   the location where Mr. Cates was placed under arrest?

1   A    Yes, sir.  Clarksville, Arkansas and Ft. Smith, Arkansas

2   are separated approximately 60 miles.  So, we're about an hour

3   away.

4   Q    I gather that there is no federal courthouse in

5   Clarksville, the location where Mr. Cates was arrested?

6   A    That is correct.  There is not.

7   Q    The federal courthouse would be in Ft. Smith where your

8   offices are located?

9   A    Yes, sir.

10  Q    Can you explain to the Judge how is it that you come to

11  be involved in this case?

12          How is it that you traveled from Ft. Smith to

13  Clarksville to encounter Mr. Cates?

14  A    I received a telephone call from Special Agent Tom

15  Brennis, B-R-E-N-N-I-S, out of the Erie RA in Erie,

16  Pennsylvania.

17  Q    And what did Special Agent Brennis ask you to do or what

18  did you two talk about?

19  A    He advised me that Mr. Cates had been arrested in

20  Clarksville, Arkansas, and a 14-year old minor was with him at

21  the time and was being held as a runaway, and that they

22  were -- the Erie RA FBI had been investigating a potential

23  child abduction, missing girl.

24  Q    At that point in time, from what you were aware of, there

25  were no federal charges against Mr. Cates that were pending in

1   court?

2   A     No, sir, there were not.

3   Q     He was being held in Clarksville on a Montana state

4   warrant?

5   A     That is correct.

6   Q     So, once you get the call, approximately when did you

7   talk to Special Agent Brennis on April 16, if you recall?

8   A     That would have been some point in the afternoon.

9   Q     Subsequent, though, to Mr. Cates' arrest, I gather?

10   A     Oh, yes, sir.

11   Q     After his arrest because there would have been no reason

12   to call him?

13   A     Yes, sir.

14   Q     Once Mr. Cates is arrested, sometime after that, you get

15   a call from the FBI in Erie and then you get on the road for

16   about an hour to Clarksville?

17   A     Yes.

18   Q     What happens then when you get to Clarksville?

19   A     Meet with Detective Larry Jones with Clarksville Police

20   Department. Met with Officer Kenneth Kennedy at the jail and

21   sort of decided a plan of strategy as to who we wished to

22   interview first and seek an interview from and go from there.

23   Q     If you recall, approximately what time was that?

24   A     I don't recall because we did one interview prior to

25   interviewing Mr. Cates, and I don't recall what time we

1  started that interview.

2  Q    Who did you interview prior to interviewing Mr. Cates on

3  this case?

4  A    It was the 14-year old runaway.

5  Q    You interviewed her for a fairly lengthy period of time?

6  A    Yes, sir, we did.

7  Q    When you interviewed the girl, Mr. Cates was where?  Did

8  you know where he was at that point in time?

9  A    I knew he was somewhere within the jail, the detention

10  center, but I wasn't aware of which cell, for example.

11  Q    So, after you interviewed the girl, then were steps taken

12  to contact her parents and let them know, hey, we found your

13  daughter.  She's okay?

14  A    Yes.

15  Q    Once all of the work you had to do with regard to the

16  14-year old girl was completed, then you turned your attention

17  to Mr. Cates?

18  A    Yes.

19  Q    That was approximately 10:45 at night?

20  A    We started in our interview with Mr. Cates at

21  approximately 10:45 in the evening.

22  Q    Can you explain to the Court kind of the layout of the

23  room or where -- give the Court as much detail as you can on

24  the location of where you interviewed him?

25  A    It's a small detention center, and the room, I believe is

1  there -- used probably as a multi-purpose room, but it's used

2  as a medical facility.  There is a small table.  It's a small

3  room.  Roughly --

4  Q    I'm sorry. I didn't mean to interrupt you.

5  A    Rough estimate six, six-by-10 would be a rough estimate

6  of the size of the room.

7  Q    When you interviewed Mr. Cates, is he interviewed

8  handcuffed or shackled or in any way restrained?

9  A    No.

10  Q    And there is some mention made in your 302 that Mr. Cates

11  appeared to be shivering or cold?

12  A    Yes.  When he entered.

13  Q    When he came into the room?

14  A    Yes, sir.

15  Q    So, you were already in the interview room when Mr. Cates

16  was brought in?

17  A    Yes, sir.

18  Q    Who else was in the room with you besides you and

19  Mr. Cates?

20  A    Detective Larry Jones.

21  Q    With regard to him shivering, do you take any steps to

22  alleviate that?

23  A    Yes.  Asked him if he needed a blanket or anything to

24  warm himself up.  He accepted the offer for the blanket.  We

25  got him one.  He received it.  I asked him if he was okay and

1  he said he was fine.

2  Q    What then happened?

3  A    We initiated our interview process essentially.  And in

4  this particular instance, it was, actually, the conversation

5  was started by Mr. Cates.

6          He was fairly angry, wished to -- he went on the

7  offensive, for lack of a better way of putting it, wanted to

8  make sure that the 14-year old juvenile was okay, wanted to

9  make sure she had eaten, and wanted to speak with her, was not

10  inclined at that point to talk with us until he was assured

11  that the 14-year old girl was okay and had been taken care of.

12  Q    At this initial point when he starts talking, does

13  Mr. Cates appear to you to be injured in any way?

14  A    No.

15  Q    Does he appear to be under the influence of either drugs

16  or alcohol?

17  A    No, sir.

18  Q    Does he appear to know what is occurring around him?

19  A    Yes, sir.

20  Q    Is he appearing to you like he has any mental health

21  issues or, not to be flippant, like he's hearing voices or

22  having any sort of mental health distress?

23  A    No issues whatsoever.

24  Q    Is he having any difficulty understanding what you're

25  saying?

1    A    None at all.

2    Q    You didn't have any difficulty understanding what he was

3    saying?

4    A    Nothing.  No problems.

5    Q    Did you respond to his concerns about the girl?

6    A    Yes, we did.

7    Q    What did you say?

8    A    We told him that he would not -- well, first of all,

9    we're not in a position, neither the FBI, nor Clarksville

10   Police Department, it's not our jail, our detention center.

11   So, we're not in a position to set the policy that they have

12   in place.  So, we could not make that decision whether he's

13   going to be able to see this juvenile or not.

14         Essentially, he was told, in that regard, that his

15   wish would be provided to the on-duty personnel who would

16   forward that request to the supervisor the following day.

17         We did tell him that she had eaten, that she was

18   fine.

19   Q    So, you responded to any concerns he had with regard to

20   the girl?

21   A    Yes, sir.

22   Q    I just want to back up to the issue of providing

23   Mr. Cates a blanket for one second.

24         Was any effort made by either yourself or any other

25   officer that you're aware of to place Mr. Cates in a room that

1  was especially cold or anything like that in order to wear him
2  down or anything like that?
3  A    No, not at all.
4  Q    He just came in and was shivering and you made
5  arrangements to get him a blanket?
6  A    I've done several interviews in that particular room.
7  When we go to that detention center, that is the room that
8  we're offered up.  That is the normal procedure.
9  Q    Did Mr. Cates say anything or further explain why he was
10  shivering or say anything -- give any cause to the reason that
11  he was shivering other than that he was cold?
12  A    That was it.
13  Q    What happens after you tell Mr. Cates, hey, the girl's
14  okay.  We've given her some food.  We've taken care of her.
15        What happens after that?
16  A    We explain to him that we're here because of the issue of
17  his arrest.  We would like to talk with him.  And so, we
18  explained that we had already contacted the 14-year old
19  juvenile and she had spoken with us.  We believed that she had
20  been truthful in her statements.
21        We advised Mr. Cates that we did believe her and
22  that she told us that he did not kidnap her.  That she loved
23  him and that she willingly went with him.
24  Q    After you told him that, what happened?
25  A    He agreed to talk to us and then started complaining

1  about his legal issues in Montana.  We stopped him at that

2  point because now we're getting into where we're wanting to

3  direct our line of questioning to the incident at hand.

4          And so, I laid out my -- the FBI FD395 which is an

5  advice of rights form.  Laid that out in a position for

6  Mr. Cates to be able to read along and read the form verbatim

7  to him.

8  Q    Now, before we talk about the rights form, you told him

9  -- he starts to talk about his Montana state case, and you,

10  essentially, say to him, hey, we're not here to talk to you

11  about that.  I really don't want to hear anything about that?

12  A    That's true.

13  Q    You drove from your location in Ft. Smith to Clarksville

14  not to interview him about his Montana state case but to

15  investigate the circumstances of him transporting the 14-year

16  old girl?

17  A    That's correct.  At that point I had no idea what the

18  Montana issue was.

19  Q    Had anyone from the FBI or any other law enforcement

20  officer provided you extensive information about Mr. Cates'

21  background prior to you interviewing him?

22  A    No.

23  Q    So, did you know really anything about what was going on

24  in his personal life or medical history or anything like that?

25  A    No.

1  Q    You had just been -- had a brief conversation with the

2  Erie FBI agent and you were asked to go to Clarksville to

3  interview Mr. Cates?

4  A    That is correct.

5  Q    From the time you're notified to go to Clarksville, did

6  you have any time to obtain background information on

7  Mr. Cates?

8  A    No, I did not.

9  Q    Let me show you what I've marked as Government's Exhibit

10 No. 1 and ask you if you can identify that?

11 A    Yes, this is the FD395 advice of rights form that I

12 filled out and that Mr. Cates signed.

13 Q    You read it allowed to Mr. Cates?

14 A    Yes, sir.

15 Q    Did he indicate any difficulty in understanding it?

16 A    Nothing.  No problem.

17 Q    Did he say hold the phone -- did he stop you at all or,

18 hey, can you explain that again or anything like that?

19 A    No.

20 Q    Did he sign the form agreeing to waive his rights?

21 A    Yes, sir, he did.

22 Q    Is the form witnessed by yourself and another officer?

23 A    Yes, sir.  Detective Henry Jones.

24 Q    What time does it indicate that Mr. Cates would have

25 executed that rights waiver?

1   A    He signed it at 10:51 p.m.

2   Q    After Mr. Cates signed the Miranda rights waiver form,

3   you then begin to interview him?

4   A    Yes, sir.

5   Q    Mr. Cates provides a fairly extensive amount of

6   information?

7   A    Yes, sir.

8   Q    You end up interviewing him for approximately a little

9   less than two hours?

10  A    That sounds about right, yes, sir.

11          MR. TRAKAS:  Object.  If we can possibly phrase some

12  of these questions that Agent Caudle answer them as opposed to

13  have the question and answer built into it where Agent Caudle

14  answers yes or no.  Generally leading.

15          THE COURT:  Okay.  Caution counsel.

16  BY MR. TRABOLD:

17  Q    Sure.  Now, with regard to discussing the rights with

18  him, do you discuss further the issue of Mr. Cates being

19  represented in Montana?

20  A    Yes.  We were aware of a faxed letter that had been --

21  well, a letter that had been faxed to the detention center

22  prior to the interview with Mr. Cates.  And in this letter, it

23  was from an Attorney Torger.  I believe that is spelled

24  T-O-R-G-E-R and I'm not exactly sure of the last name.

25  Q    Let me just stop you because I might have something that

1   is going to help you.

2           I've marked this as Government's Exhibit No. 2 and

3   ask if you can identify what that is?

4   A    Yes, sir.  This is either -- well, this appears to be a

5   copy of the faxed letter that was received.

6           His last name is spelled O-A-A-S.

7   Q    That is a letter from who?

8   A    This is a letter from Torger, an attorney at law.  It

9   appears to be in Montana.  That where he states that he is

10  Donald Cates', a/k/a Max Cates, Montana attorney.

11  Q    How is it that you became aware of that letter?

12  A    This was provided to us by one of the or the jail

13  official that was present that received the fax.

14  Q    Would that fax then have come into the detention center

15  you've already spoke about?

16  A    I'm not sure if it came into the detention center or the

17  sheriff's office which is right next door, but it was brought

18  to the attention of the detention deputy who had brought it to

19  our attention.

20  Q    Could you give the Court a sense of when you would have

21  received that letter relative to when you interviewed

22  Mr. Cates?

23  A    It was prior to interviewing Mr. Cates.

24  Q    Now, did you then ask Mr. Cates, during the process of

25  him waiving his Miranda rights, about whether he wanted

1    Attorney Torger to be there with him?

2    A    We were aware, since he had already brought it up during

3    the initial part of the interview, that he had a legal issue

4    in Montana.

5         So, we, after he signed his advice of rights form, I

6    then asked him if he wished to have who was representing him

7    on the Montana issue.  He advised it was Torger as well as

8    some other unnamed attorneys that were working on his appeal.

9         I asked him if he wanted Torger to represent him on

10   this particular issue that we were interviewing him over that

11   evening.  His answer was no.

12        I asked him if he wanted any of the other unnamed

13   attorneys to represent him.  His answer was no.

14   Q    You did not tell Mr. Cates at that point in time or at

15   any other point in time about this fax?

16   A    That is correct.  I did not.

17   Q    Now, once you questioned him and he waives -- once he

18   waives Miranda, you talked to him about whether he wants

19   Torger Oaas, you then begin questioning him about the

20   circumstances that involved the 14-year old girl?

21   A    Yes, sir.

22   Q    Would you characterize Mr. Cates as providing an

23   extensive amount of detail when you interviewed him?

24   A    Yes.  Fair amount of detail, yes, sir.

25   Q    Did he have any trouble answering your questions?

1   A    No, sir.

2   Q    Did Mr. Cates share with you how it is that he met up

3   with the girl?

4   A    Yes, he did.

5   Q    What is it that he explained to you in that regard?

6   A    He was online in a chat room that the 14-year old girl

7   was online and as well.  They met in this chat room, I believe

8   it was called Haunting Echos, and they had been about two

9   years prior and chatted several times, numerous times in the

10  chat room, struck up a relationship online.  Started

11  exchanging telephone calls, letters and would have extensive

12  telephone conversations.

13  Q    Did he indicate to you that at some point in time he made

14  the decision to come to Erie?

15  A    Yes, sir, he did.

16  Q    Did he indicate to you the circumstances about how that

17  came about?

18  A    Yes, sir.

19  Q    What did he say?

20  A    He advised that he did not feel that he was getting

21  justice in his Montana legal issue, and so, he decided that he

22  would flee the state and leave the issue for his attorney to

23  handle in his absence.

24          He traveled to Erie, Pennsylvania, to meet in person

25  the 14-year old juvenile and then when they met, they left the

1    area together and started traveling to the point to where they

2    were picked up in Clarksville.

3    Q    Was Mr. Cates able to provide you some fairly specific

4    detail about what it is when he was actually in Erie with the

5    girl?

6    A    Yes.

7    Q    Did he provide you some detail about what happened when

8    he and the girl left Erie?

9    A    Yes, sir.  May I review my 302?

10   Q    Sure.

11   A    Just to correctly reflect it.

12        He advised that he met the 14-year old juvenile in

13   Erie and that they were talking outside, outside when two

14   police officers drove passed them.  At that point Cates,

15   Mr. Cates, thought that the police were already seeking him.

16   So, advised that he was not going to stick around in Erie to

17   find out if they were already searching for him.

18        He started to leave, was separating -- he advised he

19   was separating himself from the 14-year old juvenile, and she

20   followed him and stated she wanted to go with him.  So, he

21   tried to talk her out of leaving with him but she wanted to

22   go.  So, they departed Erie together.

23   Q    Does Mr. Cates talk to you about having a concern that

24   phone records could be checked or that he could be tracked

25   down somehow by phone records?

1   A    He had had several concerns.  When he fled the State of

2   Montana, he knew that he had been maintaining telephone

3   contact for two years with the 14-year old in Erie,

4   Pennsylvania.

5           He believed that law enforcement would gain access

6   to those phone records, would understand that there were

7   numerous calls to Erie, and surmise that that would be the

8   place he would head.

9           He took a debit card with him that he explained that

10  he only wanted to use for emergency purposes because he was

11  aware, again, that law enforcement was able to track

12  transactions through his debit card?

13  Q    Did he share with you some concern about a cell phone

14  activity?

15  A    Yes.  He knew that law enforcement could track him

16  through, and the 14-year old juvenile who had a cell phone as

17  well, that they could be tracked through their cell phone

18  activity.  And the cell phones turned off, the batteries

19  separated, and the phones and batteries thrown out separately.

20          In addition, he advised that on his way to Erie, he

21  had made contact with the 14-year old and provided her all of

22  his user ID names online and the passwords and had her delete

23  all of his online accounts.

24  Q    He also indicated something to you about a concern about

25  the video surveillance system at the CVS where he met the

1  girl?

2  A    I would just like to double check that to make sure I'm

3  not getting that statement confused with the girl's.

4          I'm going to need you to repeat the question.

5  Q    Sure.  Was there any concern -- did he say anything to

6  you with regard to meeting up with the girl at a CVS drug

7  store, if you recall?

8  A    I don't recall because I'm not seeing it in here at this

9  point.

10  Q    Did he say anything to you with regard to he and the girl

11  exchanging pictures of themselves over the Internet?

12  A    Yes.  They were exchanging naked pictures of themselves

13  and texting those pictures to each other.  He advised that he

14  contacted the girl and told her that she no longer needed to

15  be doing that after seeing some media reports where law

16  enforcement was creating legal issues for the juveniles that

17  were doing this activity.

18  Q    Did Mr. Cates share with you information about what he

19  and the girl did in Arkansas and where they went?

20  A    He advised that they had -- they were hitchhiking across

21  the U.S., basically, with truck drivers and had gotten as far

22  as Memphis, and I believe it was in the west Memphis area

23  just -- which is within Arkansas, had hitched a ride with what

24  he described or who he described as an ex-FBI agent and that

25  got him as far as Clarksville, Arkansas.  And then they stayed

1    at a motel there that night and then the morning, the day that

2    we're talking to him, were on their way out of town,

3    hitchhiking, when they were stopped.

4    Q    At some point during the interview, did you ask Mr. Cates

5    whether he had ever had sexual relations or sexual activity

6    with the 14-year old girl?

7    A    Yes, I did.  I asked him specifically if he had sex with

8    the young girl.  He thought about it for a few minutes, didn't

9    say anything, and then eventually advised that he would like

10   to speak, go over that question, speak with his attorney about

11   that before answering that question.

12   Q    Did you probe further when he said that?

13   A    Oh, yes, sir.  You know, he said that's not a problem.

14   And then I specifically asked him if he was wanting to talk to

15   an attorney now?  That was not the case.  Asked him if he was

16   wishing to stop the interview at that time to confer with an

17   attorney?  He was willing to continue the interview and I

18   wanted to verify that he was not at that point invoking --

19   saying I want to speak with an attorney.  And he advised me

20   that he was willing to continue the interview without an

21   attorney present.

22   Q    He just didn't want to answer that question?

23   A    He did not want to answer that specific question, yes,

24   sir.

25   Q    He never did answer that question?

1   A    No, he did not.

2   Q    Then the interview continued?

3   A    Yes, sir.

4   Q    Now, at some point in time, was an issue brought to your

5   attention that perhaps Mr. Cates might be suicidal?

6   A    Yes, sir.  That was at some point definitely in the last

7   half of the interview.  It seems like it was a little closer

8   toward the end.  I don't recall specifically how we got the

9   notification.  That it seems like there was either a note

10  slipped under the door or a, potentially, even one of the

11  detention deputies knocking on the door and advising that I

12  needed to make contact with my supervisor.

13          So, I contacted my supervisor and was advised that

14  one of the other FBI offices, I don't recall if that was

15  with -- in Montana or Erie or elsewhere, but and received a

16  telephone call from Mr. Cates' father indicating that his son

17  potentially could be suicidal.

18          So, I got that information and then asked, went over

19  it, reviewed it with Mr. Cates, and asked him if he had any

20  issues or thoughts of suicide, and he advised that he did not.

21  Q    Prior to you receiving that notification, had there been

22  any indication from Mr. Cates that he was perhaps suicidal?

23  A    No.  Absolutely nothing.

24  Q    Was there any outward manifestation at all that he was

25  having any mental health issues?

1  A    No, sir.

2  Q    Does an issue come up or does Mr. Cates in some fashion

3  or form mention something about medications to you?

4  A    Yes.  He advised, again, this is within the latter half

5  of the interview, advised that he had some medication on him

6  when arrested that the jail was in possession of.

7  Q    What did you say in response to that?

8  A    Told him that we would check on that.  Again, I'm not in

9  a position, nor is the Clarksville Police Department detective

10  in a position to provide medication to an inmate.

11          So, I told him the best I could do was to make the

12  jail personnel aware that Mr. Cates had some medication in his

13  belongings.

14  Q    In the course of this conversation about his medication,

15  did Mr. Cates tell you he needed the medication immediately or

16  that second or anything like that?

17  A    No.  Oh, no, sir.

18  Q    When you explained to him what was going to happen with

19  the medications, did he appear to have -- become agitated

20  about that or was there any problem with that?

21  A    No problem whatsoever.

22  Q    And at that point in time, with regard to his

23  medications, did he have a specific discussion with you about

24  what those medications were and what he needed them for or was

25  it just a general talk of medication?

1  A    General talk of medication.  I had no idea if we were

2  talking aspirin or prescription medicine.

3  Q    Prior to him bringing up the issue of medications, were

4  you on notice in any fashion or form that he had health issues

5  or mental health issues that he needed medication for?

6  A    No, there was nothing exhibited in his behavior.  Nothing

7  was provided by any other personnel to give us any indication

8  of that.

9  Q    Now, at some point in time, did the issue of Mr. Cates

10  being hungry or thirsty come up?

11  A    Yes, sir, it did.

12  Q    Approximately when during the course of the interview?

13  A    Again, it was probably toward the latter half of the

14  interview.  I don't recall now if he just said he was hungry

15  or if I asked if he was hungry, or if Detective Jones asked

16  but it just sort of hit all of a sudden.  It was probably

17  somebody's stomach growling.  It was obvious it was late in

18  the evening.  We knew he had been incarcerated for sometime.

19  So, you know, the man had missed a meal. So, we wanted to make

20  sure that issue was covered.

21  Q    Was Mr. Cates then provided something to eat and drink?

22  A    Yes, he was.

23  Q    While you were there with him?

24  A    Yes, sir.

25  Q    Did he eat anything?

1  A    He ate a portion of it.  He didn't eat all of it, by any

2  stretch of the imagination.

3  Q    Incidentally, what was Mr. Cates wearing when you

4  interviewed him, if you recall?  I mean, he had either his own

5  clothing on or prison garb?

6  A    It would be prison apparel because his clothing -- he was

7  not wearing his clothing.  They had it in the -- in his

8  possessions, the jail did.

9  Q    Now, we talked a little bit about the fax, Government's

10 Exhibit No. 2.  Besides asking Mr. Cates specifically if he

11 wanted his Montana attorney to be there with him, did you take

12 some additional steps of a somewhat internal nature when you

13 got that fax?

14 A    Yes.  I don't know if I read the fax in its entirety.  It

15 was basically stating, please be advised that Mr. Cates hereby

16 invokes his right to remain silent and any interrogation is

17 prohibited without counsel present and signed by Torger Oaas.

18        In my experience and training, I was of the opinion

19 that Torger is not in a position to where he can invoke for

20 the individual that we wished to question.  I wanted to verify

21 my opinion.  So, I contacted our chief division counsel, Steve

22 Frazier, from the Little Rock division and reviewed the

23 situation with him.  He was in agreement that I was of the

24 right opinion and that we could go forward and interview

25 Mr. Cates.

1    Q    Now, after you ended the interview, did you then take

2    steps to let the detention folks know that Mr. Cates may need

3    some medication?

4    A    Yes, sir.

5    Q    At any point in time during your contact with him, did

6    Mr. Cates provide you any indication, either directly or

7    indirectly, that he did not understand what was occurring?

8    A    No.  Mr. Cates came across as a pretty intelligent young

9    man.

10    Q    He shared with you, at least at the initial outset of

11    your contact with him, that he had been in the legal system

12    before?

13    A    Yes, sir.

14    Q    In fact, Mr. Cates was a fugitive from the legal

15    proceedings in Montana.  That's how he ended up in

16    Clarksville?

17    A    That's what he told me, yes, sir.

18    Q    Did anyone, as you interviewed Mr. Cates, place their

19    hands on him or have any physical contact with him?

20    A    Oh, no, sir.

21    Q    There was no effort made to restrain him further or

22    anything?

23    A    No, sir.  Like I said, Mr. Cates initially was angry.  He

24    calmed down very quickly and our interview was fairly close to

25    the type of discussion we're having here today.

1 Q Did Mr. Cates at any point in time seem to you like he

2 was in distress?

3 A No, sir.

4 Q Was there ever anything that Mr. Cates asked for that you

5 did not provide to him?

6 A No, sir.

7    MR. TRABOLD:  Nothing further.

8       CROSS EXAMINATION

9 BY MR. TRAKAS:

10 Q Good morning, Agent Caudle.

11 A Good morning, sir.

12 Q When Mr. Cates -- before Mr. Cates agreed to speak with

13 you, he indicated to you he had concern for the minor.

14    Did that concern appear genuine to you?

15 A Yes, sir, it did.

16 Q He was concerned that she was okay, nothing was going to

17 happen to her, and that he was concerned about her before he

18 was concerned about himself?

19 A I'll agree with that, yes, sir.

20 Q There came a time when you came together in this medical

21 room, this six-by-10 interview room; is that correct?

22 A Yes, sir.

23 Q That would have been about seven o'clock?

24 A No, sir.  That was at -- that started at 10:45 p.m.

25 Q And when you first came into the room, were you in the

1  room first?  Was Mr. Cates in the room first?

2  A    I, myself, and Detective Larry Jones were in the room

3  first.

4  Q    And did there come a time when Mr. Cates came in?

5  A    Yes, sir.  He was escorted in by a detention deputy.

6  Q    You and Mr. Jones were there at the time?

7  A    Yes, sir.

8  Q    Anyone else?

9  A    No, sir.

10  Q    Mr. Kennedy in there?

11  A    No.  There is an outer room outside of that and that's

12  where we had met prior to any of the interviews and then we

13  had separated from Mr. Kennedy.

14  Q    How long did Mr. Kennedy -- I'm sorry -- how long did

15  Mr. Jones remain in the room with you?

16  A    Throughout the entire interview.

17  Q    Both of you were in there together?

18  A    Yes, sir.

19           THE COURT:  Excuse me.  Is Jones FBI also?

20           THE WITNESS:  No, sir.  He is a Clarksville

21  detective.

22  BY MR. TRAKAS:

23  Q    What was Mr. Jones' function?

24  A    He was the second person present for the interview.

25  Q    Did he ask any questions?

1  A    Yes, sir.  He participated in the interview.

2  Q    Now, before the interview started, you became aware of an

3  exhibit the government has put forth, a letter handwritten

4  from an attorney named Torger Oaas; is that correct?

5  A    Yes, sir.

6  Q    You had that information in advance of your speaking with

7  Mr. Cates?

8  A    Yes, sir.

9  Q    Did I understand that correctly?

10  A    Yes, sir, you did.

11  Q    You were aware that he had another action pending

12  elsewhere?

13  A    Yes, sir.

14  Q    And he had attorneys representing him in that action?

15  A    Yes, sir.

16  Q    In fact, the notes indicated that not only did he have an

17  attorney representing him in that matter, he had attorneys

18  representing -- he had several attorneys representing him on

19  appeals that were revolving around that matter; am I correct?

20  A    The appeal process, didn't actually learn that until that

21  was stated by Mr. Cates.

22  Q    So, at some point you knew that he had several attorneys

23  that represented him?

24  A    On the Montana issue, yes, sir.

25  Q    You received this fax before speaking to him which very

1  clearly indicates, I'm Donald Cates', a/k/a Max Cates, Montana
2  attorney.  You have Mr. Cates in your custody.  Please be
3  advised that Mr. Cates hereby invokes his right to remain
4  silent and any interrogation is prohibited without counsel
5  present.
6  A    Yes, sir.
7  Q    You clearly understood the document?
8  A    Yes, sir.
9  Q    That document meant what to you?
10 A    Didn't mean anything.  It, again, according to my
11 experience and my training, he cannot invoke for his client.
12 His client had to invoke for himself.
13       I verified that through our chief division counsel.
14 Q    If an attorney had walked into the room and said, I don't
15 want you speaking to my client, the client hasn't said
16 anything, would you continue questioning the client?
17       MR. TRABOLD:  Object.  Calls for speculation.
18 Nothing -- that didn't happen here.
19       THE COURT:  We'll sustain.
20 BY MR. TRABOLD:
21 Q    Mr. Cates comes in.  He's shivering; am I correct?
22 A    Yes, sir.  He was shaking.
23 Q    You offer him a blanket?
24 A    Yes, sir.
25 Q    Mr. Cates tells you he is hungry, has not eaten in 14

1   hours.  You bring him food?

2   A    Yes, sir.  We had food delivered, yes, sir.

3   Q    Mr. Cates tells you about medication. You tell him you'll

4   see to it that the people involved in his detention are aware

5   that he had medication?

6   A    Yes, sir.

7   Q    Are you aware that Mr. Cates suffers from borderline

8   schizophrenia?

9   A    No, sir.

10  Q    How about a bipolar disorder?

11  A    No, sir.

12  Q    Migraine headache?

13  A    No, sir.

14  Q    Hypothyroidism?

15  A    I can help you here.  I'm not aware of his medical

16  history at all.

17  Q    Are you aware that he takes Albuterol, Synthroid,

18  Nortriptyline and tetracycline?

19  A    No.

20  Q    Do you know what that medication does?

21  A    I have no idea.  No, sir.

22  Q    It's an anti-depressant.

23  A    Okay.

24  Q    Had you known he was on these medications and those are

25  the medications he was discussing, would your response to the

1  situation be any different?

2          MR. TRABOLD:  Objection.  Calls for speculation.

3          THE COURT:  We'll sustain.

4  BY MR. TRAKAS:

5  Q    Did Mr. Cates appear agitated to you at any point?

6  A    At the beginning of the interview, yes, sir.

7  Q    Now, there came a point of questioning where you -- where

8  Mr. Cates indicated to you he wanted to speak with an

9  attorney?

10  A    No, sir.  There came a point in the interview when I

11  asked him specifically if he had sex with the juvenile.  He

12  stated he did not want to answer that question without first

13  talking to an attorney.

14  Q    So I understand this correctly, he's cold, you bring him

15  a blanket.  He's hungry, you bring him food.  He needs his

16  medication, you say you'll take care of it by giving it to the

17  detention center.  He tells you he wants a lawyer.  Your

18  response, I'm going to ask him some more questions?

19  A    Well, first of all, again, let me correct -- there is

20  just one aspect of the last statement you made.

21          He didn't say that he needed medication.  What he

22  said was he had some medication in his possession that the

23  jail had when he was arrested.

24          But then getting to the last issue as to him saying

25  that he did not want to answer that question without

1  conferring with his attorney, then, yes, sir.  We did continue

2  questioning.  That was after checking with him to ask him if

3  he was invoking his right to an attorney?  Did he want an

4  attorney present at that time.  Did he wish to continue the

5  interview?  When he said he was willing to continue the

6  interview, then we did continue questioning.

7  Q     Is this your normal policy?  If someone says, I want to

8  speak to an attorney, is this your normal policy to ask him

9  some more, whether or not they would like to speak to an

10 attorney?

11 A     Our normal policy, when they say they want to speak to an

12 attorney, to be blunt, it's a show stopper.  We do not do any

13 further questioning.

14        So, that's why I was making it perfectly clear in

15 his mind and my mind if he was requesting an attorney or just

16 saying he did not wish to answer that question without first

17 talking to his attorney.

18 Q     When Mr. Cates came in, he was shivering as you

19 described.  Did that raise any issues for you?

20 A     No.  Part of it is normal.  It could have been warm and I

21 mean, a lot of folks come in shivering when the FBI is there

22 to interview them.  It's not unexpected to be nervous but I

23 knew that part of it was that it was chilly in the room as

24 well.

25 Q     Did he concern you when he raised the issue of

1  medications as well, that there might be a relationship
2  between the two?

3  A    No, not at all.

4  Q    If he had been sweating profusely, would that have
5  changed anything?

6  A    It probably would have.  In a cold room, yes, sir.

7  Q    Was the room cold?

8  A    It was chilly, yes, sir.

9  Q    Were you cold?

10 A    It was cool in there.  I was chilly, yes, sir.

11 Q    Was Mr. Jones cold?

12 A    I don't know.  I didn't ask him.

13 Q    But you didn't need a blanket?

14 A    No, sir.

15 Q    Mr. Jones didn't need a blanket?

16 A    No, sir.

17 Q    But Mr. Cates was apparently on medication you were aware
18 of?

19 A    We got him a blanket, yes, sir.

20 Q    As you described it, he was nervous in all likelihood?

21 A    Yes, sir.

22 Q    Not unusual for a 21-year old in this type of facility to
23 be nervous?

24 A    I don't think it would be unusual at all.  No, sir.

25 Q    Not unusual to be nervous when pulled over on the highway

1  by a police officer?

2  A    Sir, I'm nervous right now.

3  Q    We all are.

4        How long did you continue to question Mr. Cates

5  after he asked to speak to an attorney?

6  A    Well, again, he didn't ask to speak to an attorney.

7  Q    Well, he said he didn't want to answer that particular

8  question without first talking to any attorney.  He's asking

9  for an attorney?

10  A    No.

11  Q    I don't mean to be argumentative.

12  A    No.  No, he stated that he did not want to answer that

13  question without first talking to an attorney.  So, then I

14  specifically asked if he was invoking his right to an attorney

15  at this time.  He advised he was not invoking his right to an

16  attorney at this time.  He just did not wish to answer the

17  question about having sex with the juvenile without conferring

18  with an attorney first.  He was specific to that question.

19        So, I asked him, specifically, if he wished to end

20  the interview at this time and he advised that he wished to

21  continue the interview at this time without an attorney

22  present.  We covered that in depth. I wanted to make sure that

23  there were no -- that there was no confusion.

24  Q    How long did the interview take?

25  A    It started at, again, approximately 10:45 p.m. and we all

1    were fairly tired by the time we got out of there.  It was

2    just a little bit after 12:30 that I realized that I did not

3    mark down an ending time.  And so, I estimated that it was

4    approximately 12:30 when the interview would have ended.

5    Q    After Mr. Cates stopped shivering, was his line of

6    answering rather methodical?

7    A    Not sure I actually understand.

8    Q    Without emotion?

9    A    He was fairly emotional.

10   Q    Did he continue to be nervous throughout the interview?

11   A    Well, that I don't know, but as our rapport, as our

12   comfort level with each other, with the time that we were

13   spending, he was exhibiting less discomfort with us.

14   Q    Would you say he exhibited less discomfort after he asked

15   you to speak to an attorney about that particular issue?

16   A    No, I didn't notice any difference between asking the

17   question about the having sex with the girl and then his

18   response.

19   Q    He never answered that question?

20   A    No, sir.  He never did.

21   Q    Do you have any idea when the warrant was activated that

22   specifically precipitated the arrest?

23   A    I think it was signed on April 20 of 2009.

24   Q    So, the warrant precipitating the arrest was signed on

25   April 20, 2009?

1    A    I'm sorry.  Let me -- the warrant that would have
2    precipitated --
3    Q    The arrest in Montana.
4    A    Oh, I'm sorry.  I misunderstood your question.
5    Q    You're not aware?
6    A    Yes.  Montana issue, I'm sorry.  I have no idea.  I
7    thought you were referring to the federal warrant.
8              MR. TRAKAS:  I have no further questions.
9              THE COURT:  Anything further, Mr. Trabold?
10             MR. TRABOLD:  Just briefly.
11                    REDIRECT EXAMINATION
12   BY MR. TRABOLD:
13   Q    With regard to the timing of Mr. Cates' request for food,
14   did that occur early on in the interview or more toward the
15   end.
16   A    That was -- it was easily in the latter half of the
17   interview.
18   Q    With regard to the medication issue, did that occur in
19   the first half or the latter half?
20   A    That was in the latter half as well.
21   Q    After you gave Mr. Cates a blanket, did he indicate to
22   you any further distress from being cold or any issue with
23   that?
24   A    No.  None whatsoever.
25             MR. TRABOLD:  Nothing further.

1          THE COURT:  Did you want to admit Government's
2     Exhibits 1 and 2?
3          MR. TRABOLD:  Yes, sir.
4          THE COURT:  One and two are admitted.
5          MR. TRABOLD:  Thank you.
6          THE WITNESS:  Thank you, sir.
7          MR. TRABOLD:  Your Honor, just as an explanation, I
8     just wanted you to be aware that the reason that the agents
9     and the witness are testifying without their business clothing
10    on is because their luggage was lost in traveling here.
11         We don't have anything further, Your Honor.
12         THE COURT:  Put the FBI on it.
13         Did you have any witnesses?
14         MR. TRAKAS:  No, Your Honor.  If the Court may,
15    though, we would like to write on the issue of the suppression
16    to the Court before the Court renders a decision.
17         THE COURT:  That would be okay.  When do you expect
18    to have that?
19         MR. TRAKAS:  Ten days, Your Honor.
20         THE COURT:  Government a week to respond?
21         MR. TRABOLD:  Sounds sufficient, Your Honor.
22         THE COURT:  We'll take it under advisement.
23         Give both defense and government an opportunity to
24    brief the issue.
25         MR. TRAKAS:  Thank you kindly.

1    MR. TRABOLD:  I have one other issue with regard to

2    -- it's come to my attention, during the course of the

3    pendency of this case, that not only did the defendant but his

4    parents, specifically his mother, have had contact with the

5    victim in this case who is currently 15-years old.  That

6    contact has occurred outside the approval of the victim's

7    parents, and we ask that you issue an order prohibiting not

8    only the defendant but also his parents and any other family

9    member or friend therefrom having contact with the victim.

10    THE COURT:  We'll issue such an order and I'll ask

11    the government to draft such an order.

12    MR. TRAKAS:  One last point.  It's my understanding

13    that the family would like copies of any medical records as

14    he's been in the infirmary several times while he's been

15    housed here in Erie.  And if the Court would accommodate us by

16    directing that those medical reports be available to my

17    client's family.

18    THE COURT:  I don't think there is any problem.

19    MR. TRABOLD:  I don't have any objection to that.

20    THE COURT:  If there should be a problem, let me

21    know.

22    MR. TRAKAS:  Thank you, Your Honor.

23    THE COURT:  Court's in recess.

24

25                          *  *  *  *  *

I certify my original signature herein that the forgoing is a correct transcript from the record of proceedings in the above-entitled matter.


s/Patricia Sherman
Official Reporter
MARCH 24, 2010



*****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****