IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Crim. No. 09-22 Erie |
| ) | |
| DONALD RAY MAXWELL CATES, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION & ORDER

Pending before the Court is a Motion to Suppress Statements (Doc. 27), filed on behalf of defendant, Donald Ray Maxwell Cates. We have considered the Government's Response to the Defendant's Motion to Suppress (Doc. 30), Defendant's Supplemental Brief to his Motion (Doc. 36) and Government's Sur-Reply to Defendant's Supplemental Brief. (Doc. 37).

The four count indictment in this matter charges sexual exploitation of a minor, transportation with intent to engage in criminal sexual activity, travel with intent to engage in a sexual act with a minor, and inducing a minor to engage in illegal sexual activity. (Indictment, Doc. No. 6.)

On March 24, 2010, we conducted an evidentiary hearing on the motion to suppress. At the hearing all parties were represented by counsel and the following two individuals testified: 1) Kenneth Kennedy, a patrolman with the Clarksville, Arkansas Police Department, who picked up Mr. Cates on an Arkansas highway and transported him in his patrol car to a detention center; and 2) Special Agent Jimmy Caudle from the Federal Bureau of Investigation (Little Rock, Arkansas Division, Ft. Smith location), who interviewed the defendant at the detention center

some hours later.

For the reasons stated herein, we will deny the motion to suppress. Fed. R. Crim P. 12(d).

## I. BACKGROUND

It is alleged that Mr. Cates began his relationship with the victim via an internet "chat room"and later, conversed with her on the telephone and through letters. At the time, Mr. Cates was 19 years old and living in Montana. The victim ("S.L.") was 14 years old and living in Erie, Pennsylvania. At some point in their relationship, S.L. took naked digital photos of herself and sent them to the defendant via email between December 2008 and April 2009. Thereafter, Mr. Cates and S.L. allegedly agreed that he would travel to Erie to pick her up and run away. He traveled to Erie, Pennsylvania, tried to talk her out of running away, but nevertheless, she left home and was reported as a runaway soon thereafter. The pair hitchhiked together to Clarksville, Arkansas, and allegedly had sex several times.

On April 16, 2009 at 5:00 p.m., the Clarksville, Arkansas Police Department received a report that there were two hitchhikers at Exit 55 off Interstate 40 and U.S. Highway 64 West. Officer Kenneth Kennedy responded to the call from dispatch. When he arrived, the pair initially gave false information as to their identities, but eventually Officer Kennedy learned their names. A second patrol car responded. After running a background check, the defendant and S.L. were arrested -- Mr. Cates on the grounds of outstanding warrants issued as a result of sex offenses involving minors other than S.L. in Montana, the girl, because she had admitted she was a runaway. Mr. Cates resisted arrest, was handcuffed, and was transported to the Johnson City Adult Detention Center by Officer Kennedy. S.L. was transported in a different vehicle to an unspecified location.

During transport, which lasted roughly 35 minutes, Mr. Cates seemed rational and had no injuries. Mr. Cates was not read Miranda rights. Mr. Cates initiated a conversation with Officer Kennedy, but was not asked any questions. He stated that he had been in trouble, that nobody believed him, but did not mention any attorney. He admitted that he had met the girl on the internet and admitted he had sexual assault charges against him in Montana. He complained that he would probably not get to see S.L. again.

Special Agent Caudle was notified of Mr. Cates' arrest by in a telephone call from an Erie, Pennsylvania Special Agent. Special Agent Caudle traveled from Fort Smith, Arkansas, to the detention center, which was 60 miles away. At that time there were no federal charges against Mr. Cates; he was being held in Arkansas on the warrants issued by the State of Montana.

Special Agent Caudle interviewed S.L. first, and her parents were notified that she had been found.

At some point that evening, an attorney from Lewistown, Montana, Torger Oaas, sent a fax to the detention center in Arkansas with a time notation of "7: p.m. MDT." It reads, "I am Donald Cates AKA Max Cates Montana Attorney. You have Mr. Cates in your custody. Please be advised that Mr. Cates hereby invokes his right to remain silent and any interrogation is prohibited without counsel present." Gov't Ex. 2.

Special Agent Caudle was aware of the receipt of this facsimile prior to interviewing Mr. Cates. He had been given a copy of it by a jail official. He testified that he then contacted his Chief Division counsel, Steve Frazier, to confirm what he already believed based on his experience and training-- that he could go forward with the interview because an attorney cannot invoke Miranda rights on behalf of a client; such rights can only be invoked by the individual

3

whose testimony is being sought.

Special Agent Caudle's interview of the defendant began at 10:45 p.m. and ended at roughly 12:30 a.m. Throughout the interview the defendant was not handcuffed or restrained. He showed no sign of injury or that he was under the influence of any narcotic or alcohol, or that he was suffering from any mental distress or disorder.

In the beginning of the interview, Mr. Cates was "on the offensive," according to Special Agent Caudle. He was angry and wanted to make sure the S.L. was o.k. and had eaten; he wouldn't start a conversation until he knew she had been taken care of. Special Agent Caudle reassured Mr. Cates that S.L. was being treated well, that she had said that Mr. Cates did not kidnap her and that she willingly went with him, and that law enforcement believed she had been truthful in her statements.

Also in the beginning of the interview, Mr. Cates was shivering from the cold temperature of the interview room. He was given a blanket. Special Agent Caudle asked Mr. Cates if he was "ok" and Mr. Cates said he was fine. The room where the interview took place was the room typically used in these situations.

Mr. Cates indicated his willingness to talk and began to talk about his Montana legal issues. Special Agent Caudle told him that the interview was not about that case and that he didn't want to hear anything about the Montana state matter. Special Agent Caudle had to interrupt him to advise him of his rights. The Advice of Rights form, which was entered into evidence as Government's Exhibit 1, states the standard <u>Miranda</u> warnings, and also reads, "If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time." Mr. Cates signed the FBI's "Advice of Rights" form at 10:51 p.m., after

4

it was read to him. His signature appears below the words, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." The form was witnessed by Special Agent Caudle and Detective Larry Jones of the Clarksville Police Department, who was also present during the interview.

Special Agent Caudle asked Mr. Cates if he was represented by counsel in Montana (apparently referring to the unrelated state charges). Mr. Cates said he was, and Mr. Cates identified Torger Oaas as one of his attorneys for his appeals. Special Agent Caudle asked Mr. Cates if he wished to be represented by an attorney at that time and Cates said, "no."

The interview began and Mr. Cates made incriminating statements. He described how the two had met. He stated that he did not feel that he was getting justice in Montana and that he decided to flee the state and leave the issue for his attorney to handle in his absence. He described how he and S.L. made their plans to run away together, hitchhiked with truckers, and how they made every attempt to not have their debit card and phone records traced. Special Agent Caudle asked if he had had sex with S.L. Mr. Cates was silent for a few minutes and said he would like to go over that question with a lawyer before answering. Special Agent Caudle then asked if he was invoking his right to an attorney at that time, and Mr. Cates responded that he was not, but that he didn't want to answer that particular question without talking to his attorney first. Special Agent Caudle asked if he wished to end the interview and Mr. Cates stated he wanted to continue the interview without an attorney. He never answered the question to which he had objected.

Near the end of the interview, law enforcement agents learned that Mr. Cates' father had called and advised that Mr. Cates had previously threatened suicide. Special Agent Caudle asked

Mr. Cates if he was suicidal, and Mr. Cates denied it. Mr. Cates then advised that he had medication and that it was in his belongings which had been confiscated. He was assured that the jail would be told about the medication. Mr. Cates never stated that he needed his medication, or for what ailment it was prescribed or intended. He did not appear to be agitated or to be acting in a way so as to indicate any mental health issues. He then complained he was hungry, and was given some food and a drink.

The interview ended at approximately 12:30 a.m. on April 17, 2009.

On the witness stand Special Agent Caudle described Mr. Cates as a "pretty intelligent young man" who was aware of the legal system, who was not in any physical or mental distress, and with whom it was easy to converse.

## II. DISCUSSION

Defendant seeks suppression of statements he made to law enforcement agents. First, Mr. Cates argues that his statements to Officer Kennedy must be suppressed because Mr. Cates made those statements without first having been advised of his Miranda rights. Second, he argues that his statements to Special Agent Caudle must be suppressed because: 1) he was interrogated without counsel despite Special Agent Caudle's knowledge that he was represented by counsel; 2) he allegedly asked to speak with a lawyer in the middle of the interrogation; and 3) Mr. Cates' waiver of his right to counsel was not knowing and voluntary given his medical condition as well as the the physical atmosphere and environment during the interview.

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards

effective to secure the privilege against self-incrimination." The <u>Miranda</u> court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Id.</u> "Ordinarily, in determining whether an individual is in custody, the ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." <u>Reinert v. Larkins</u>, 379 F.3d 76, 86 (3d Cir.2004) (quotations and citations omitted).

If a person in custody "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." <u>Miranda</u>, 384 U.S. at 444-45. "Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him." <u>Id.</u> at 445. "The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned." <u>Id.</u>

The defendant may waive Miranda rights, provided that the waiver is made voluntarily, knowingly and intelligently. <u>Miranda</u>, 384 U.S. at 444. In <u>Moran v. Burbine</u>, 475 U.S. 412 (1986), the Supreme Court set forth a two-pronged test for waiver of <u>Miranda</u> rights:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the <u>Miranda</u> rights have been waived.

Moran, 475 U.S. at 421 (internal quotations marks and citations omitted). The United States Court of Appeals for the Third Circuit has also stated that a court must examine "the events that occurred and the background, experience, and conduct of the defendant." United States v. Sriyuth, 98 F.3d 739, 749 (3d Cir.), cert. denied, 519 U.S. 1141 (1997) (citations omitted).

The government bears the burden of proving a waiver of Miranda rights by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 169 (1986); United States v. Tyler, 164 F.3d 150, 156 (3d Cir.), cert. denied, 526 U.S. 1077 (1999).

During the course of a custodial interrogation, "if a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." Davis v. United States, 512 U.S. 452, 458 (1994). Whether a suspect has invoked counsel is "an objective inquiry." Id. at 459, 114 S.Ct. 2350. "It requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." McNeil v. Wisconsin, 501 U.S. 171, 178 (1991). "But if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect might be invoking the right to counsel, [Supreme Court] precedents do not require the cessation of questioning." Davis, 512 U.S. at 459. Rather, a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." Id. Federal law requires a suspect to make an *unequivocal* request for counsel. Davis, 512 U.S. at 461-62 (emphasis added)

Mr. Cates argues that he was deprived of his right to counsel because he was not told that his attorney had sent a fax in an attempt to invoke his right not to answer questions during the

8

interview. The government argues that Moran v. Burbine, 475 U.S. 412 (1986) compels us to reject this argument. In Moran, as here, police did not inform a suspect that his lawyer had attempted to contact him. Id. at 417-18. The Supreme Court held that this event, "outside of the presence of the suspect and entirely unknown to him ... ha[d] no bearing on the [suspect's] capacity to comprehend and knowingly relinquish a constitutional right." Id. at 422. The Court recognized that this information "would have been useful" to the suspect and that "it might have affected his decision to confess." Id. But the Court found that law enforcement officers need not "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." Id.

Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law. Id. at 422-23.

Moreover, in determining whether a confession was voluntary, we must satisfy ourselves that the confession was "the product of an essentially free and unconstrained choice by its maker," that it was "the product of a rational intellect and a free will" and that the appellant's will was not "overborne." United States ex rel. Hayward v. Johnson, 508 F.2d at 326 (citations omitted). Courts look to the totality of circumstances to determine whether a confession was voluntary. Those potential circumstances include not only the crucial element of police coercion, Colorado v. Connelly, 479 U.S. 157, 167 (1986); the length of the interrogation, Ashcraft v. Tennessee, 322 U.S. 143, 153-54 (1944); its location, see Reck v. Pate, 367 U.S. 433, 441 (1961); its continuity, Leyra v. Denno, 347 U.S. 556, 561 (1954); the defendant's maturity, Haley

v. Ohio, 332 U.S. 596, 599-601 (1948) (opinion of Douglas, J.); education, Clewis v. Texas, 386 U.S. 707, 712 (1967); physical condition, Greenwald v. Wisconsin, 390 U.S. 519, 520-21 (1968) (per curiam); and mental health, Fikes v. Alabama, 352 U.S. 191, 196 (1957); see also United States v. Swint, 15 F.3d 286, 289 (3d Cir.1994). We must also consider whether Miranda warnings were given; and whether an attorney was present for the interview. Swint, 15 F.3d at 289.

As for statements made to Officer Kennedy, we note that Miranda warnings are designed to protect against the evils of custodial interrogation, and therefore, such warnings need only be given "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in a significant way *and* is subject to questioning." Miranda, 384 U.S. at 478 (emphasis added). Officer Kennedy did not initiate or ask any questions while transporting Mr. Cates to the detention center; rather, Mr. Cates began talking on his own. Officer Kennedy was therefore under no legal obligation to advise him of his Miranda rights. Therefore, statements made to Officer Kennedy will not be suppressed.

As for the statements made to Special Agent Caudle, there was no coercion which predicated Mr. Cates' statements, and even so, the totality of the circumstances indicate a young man who wanted to talk and understood the consequences of not having his lawyer's advice. He knew that the line of questioning was not related to the Montana state charges, but rather, was related to his being with S.L. Special Agent Caudle testified consistently and credibly that defendant was told of his Miranda rights, he understood them, and he waived them knowingly and willingly in writing. Mr. Cates was willing to go forward with the interview without a lawyer, but for answering one question; there is no evidence to the contrary. Indeed, having

10

voluntarily and knowingly answered certain questions, defendant implicitly acknowledged his understanding of the protections afforded him – as well as his ability to stop questioning – by refusing to answer the question whether he "had sex with" the victim. Special Agent Caudle was correct in his assessment that under Moran, attorney Oaas could not invoke Mr. Cates' rights for him by sending the facsimile; the privileges against compulsory self-incrimination is "a personal one that can only be invoked by the individual whose testimony is being compelled." 475 U.S. at 434, n.4.

Furthermore, there is nothing of record to reflect that officers misled or coerced defendant into making statements. He was given a blanket, food and drink upon request. He did not appear to need medication, nor did he request it. Even though it is alleged that Mr. Cates suffered from psychiatric conditions, he produced no evidence of any such diagnoses and even so, based on the testimony of record, any arguable failure to administer medication does not rise to the level of coercion. Special Agent Caudle testified that when Mr. Cates mentioned medication, he did not know whether the medication was prescription or over-the-counter, and Mr. Cates didn't appear to want or need it. Indeed, Special Agent Caudle stated that Mr. Cates was a "pretty intelligent young man" who did not appear to be under any physical or mental distress, and that he answered questions very clearly.

Weighing all the necessary factors and based upon the totality of the circumstances, the Court finds that defendant voluntarily, knowingly and intelligently waived his Fifth amendment right to consult with an attorney and the government has demonstrated that no constitutional violations occurred during defendant's transport to the detention center or during interview with Agent Caudle. The motion to suppress statements will be denied.

## ORDER

AND NOW, to-wit, this 26th day of April, 2010, in accordance with the foregoing Memorandum Opinion, it is hereby ORDERED, ADJUDGED and DECREED that the defendant's "Motion to Suppress Statements" (Doc. 27) be and the same is DENIED.

IT IS FURTHER ORDERED THAT

1) a trial in this matter shall commence on Tuesday, May 4, 2010 at 10:00 a.m. in Erie, Pennsylvania;

2) Counsel shall submit Proposed Voir Dire and Jury instructions on or before May 3, 2010.

                                                                          Maurice B. Cohill, Jr.
                                                                    Senior United States District Court Judge

cc: record counsel