IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 09-22 Erie |
| | ) | |
| DONALD RAY MAXWELL CATES | ) | |

## RESPONSE TO SENTENCE REDUCTION MOTION

### I. INTRODUCTION

Finality "is essential to the operation of our criminal justice system." *Edwards v. Vannoy*, 141 S.Ct. 1547, 1554 (2021). "Without finality, the criminal law is deprived of much of its deterrent effect." *Teague v. Lane*, 489 U.S. 288, 309 (1989). "If the criminal justice system is to function appropriately, the imposition of a sentence must carry with it an expectation of finality and tranquility for the defendant, the government, and the public." *United States v. Mercado-Flores*, 872 F.3d 25, 30 (1st Cir. 2017).

The United States Sentencing Guideline system was created by Congress to achieve truth in sentencing. U.S.S.G., Chapter 1, Part A, "Introduction and Authority" ("Congress first sought honesty in sentencing."). The United States Sentencing Commission, in enacting the Sentencing Guidelines, acknowledged that truth in sentencing is achieved when defendants actually serve the sentences that judges imposed. *Id*. ("Honesty is easy to achieve: the abolition of parole makes the sentence imposed by the court the sentence the offender will serve, less approximately fifteen percent for good behavior."). The Sentencing Commission

1

also acknowledged that sentence reductions produce "confusion and implicit deception." *Id.* (Congress "sought to avoid the confusion and implicit deception that arose out of the pre-guidelines sentencing system which required the court to impose an indeterminate sentence of imprisonment and empowered the parole commission to determine how much of the sentence an offender actually would serve in prison.").

The defendant, Donald Cates, is currently serving a fully justified sentence of 262 months of incarceration. The sentence is a result of his 2011 guilty plea to: Count 2, Transportation With Intent to Engage in Criminal Sexual Activity, in violation of 18 U.S.C. § 2423(a) and§ 2423(e), from on or about April 12, 2009, to on or about April 16, 2009; Count 3, Travel With Intent to Engage in Illicit Sexual Conduct, in violation of 18 U.S.C. § 2423(b) and§ 2423(e), from on or about April 10, 2009, to on or about April 16, 2009; and Count 4, Inducing a Minor to Engage in Illegal Sexual Activity, in violation of 18 U.S.C. § 2422(b), from in and around August 2007, to in and around April 2009. Cates was on probation following a juvenile adjudication for sexually assaulting a seven-year-old when he committed these child exploitation crimes in this district. Cates's long history of sexual violence plainly establishes that he is a predator who must be kept away from society for as long as possible.

On January 16, 2024, Cates filed Document 84 which is a motion to retroactively reduce his sentence to time served as of February 1, 2024. The motion is based on the recent "status points" amendment to the Sentencing Guidelines –

i.e., Amendment 821 (reducing or eliminating criminal history status points)[1], 18 U.S.C. § 3582(c)(2) (authorizing existing sentences to be reduced under certain limited circumstances)[2], and U.S.S.G. § 1B1.10(b)(2)(A) (prohibiting Section 3582(c)(2) reductions below the minimum of the amended guideline range)[3].

According to the federal Bureau of Prisons website, Cates is currently serving his prison sentence at FCI Englewood in Colorado. His listed release date is April 6, 2028. As detailed below, his behavior while serving the very sentence he would like to be prematurely released from has been less than stellar.

---

[1] Part A of Amendment 821 altered the calculation of criminal history status points under the Sentencing Guidelines. The amended guideline section, that now appears in Section 4A1.1(e), states as follows: "Add 1 point if the defendant (1) receives 7 or more points under subsections (a) through (d), and (2) committed the instant offense while under any criminal justice sentence, including probation, parole, supervised release, imprisonment, work release, or escape status." Thus, a defendant who otherwise has seven criminal history points or more now receives only one additional status criminal history point, instead of two, while a defendant who otherwise has six criminal history points or fewer receives no status points at all. On August 24, 2023, a deeply divided Sentencing Commission decided to apply Amendment 821 retroactively as well as prospectively.

[2] 18 U.S.C. § 3582(c)(2): "The court may not modify a term of imprisonment once it has been imposed except that – in the case of a defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission . . . the court may reduce the term of imprisonment, after considering the factors set forth in section 3553(a) to the extent that they are applicable, if such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."

[3] U.S.S.G. § 1B1.10(b)(2)(A): "[T]he court shall not reduce the defendant's term of imprisonment under 18 U.S.C. § 3582(c)(2) and this policy statement to a term that is less than the minimum of the amended guideline range. . . ."

Cates is technically eligible for a sentence reduction under Amendment 821. His sentence, however, should not be reduced. His sentence is final, truthful, and fully justified.

## II. FLAWED AMENDMENT

The prosecution opposes any reduction in Cates's sentence based on Amendment 821. The Sentencing Commission has made many good decisions. The decision to apply Amendment 821 retroactively, however, was premised on a fundamentally flawed foundation and was not a product of consensus as many Sentencing Commission decisions have been. Instead, a fractured part of the Sentencing Commission – a bare 4-3 majority – supported the decision.[4] That decision was not only opposed by a significant part of the Sentencing Commission but also by major stakeholders, including the Criminal Law Committee of the Judicial Conference of the United States[5] and the United States Department of Justice[6].

As noted above, Amendment 821, specifically Part A of the amendment, reduced or eliminated the counting of status points in the calculation of defendants' criminal history categories under the Sentencing Guidelines. Previously a

---

[4] https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20230824/transcriptR.pdf

[5] https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202306/88FR28254_public-comment.pdf#page=9

[6] https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202306/88FR28254_public-comment.pdf#page=33

defendant received two criminal history status points if he committed the crime for which he is to be sentenced while serving a sentence for a prior criminal conviction. Now, following Amendment 821, a defendant who otherwise has seven criminal history points or more receives only one additional status criminal history point, instead of two, while a defendant who otherwise has six criminal history points or fewer receives no status points at all.

In approving Amendment 821, the Sentencing Commission did not establish that it was counter-productive to count two status points for such a significant and distinguishing fact as committing a new crime while serving a sentence for a prior crime. The Sentencing Commission also did not establish that such a blatantly recidivistic fact did not help predict future recidivism. Instead, the Sentencing Commission explained that counting two status points for such blatant recidivism did not predict future recidivism as much as was previously thought relative to defendants who did not receive status points.[7]

It is possible that the smaller-than-expected gap in recidivism rates between non-status point and status point defendants was a product of non-status point defendants recidivating more than expected instead of status point defendants recidivating less than expected. It is also possible, in fact likely, that a larger gap in

---

[7] 2023 Amendments to the United States Sentencing Guidelines, p. 51 (https://www.ussc.gov/sites/default/files/pdf/amendment-process/official-text-amendments/202305_Amendments.pdf); "Revisiting Status Points," United States Sentencing Commission, June 2022, p. 3 (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220628_Status.pdf).

5

actual recidivism rates exists, but the Sentencing Commission failed to account for a fundamental fact in calculating recidivism rates. The fundamental fact is that many status point defendants likely served additional incarceration sentences, in the form of revocation sentences, in their prior state cases as a result of their commission of federal crimes while serving those prior sentences. On November 13, 2023, the Sentencing Commission's Office of Research and Data acknowledged that this fact was not accounted for and that the failure to account for it may have resulted in the underestimation of the actual recidivism rates of status point defendants relative to non-status point defendants.

The recidivism data upon which the Sentencing Commission based Amendment 821 was produced by a study of the re-arrest rates of federal defendants who were released from federal prison, or began a term of federal probation, in 2010.[8] Re-arrest rates for the next eight years were analyzed and compared for status point and non-status point defendants. The fact that many status point defendants were likely not actually released to the community in 2010 because of their revocation sentences (i.e., they were transferred to state custody) skews the recidivism data relied upon by the Sentencing Commission. An eight-year period for a non-status point defendant who spent the entire eight years in the community is analytically different from an eight-year period for a status point

---

[8] "Revisiting Status Points," United States Sentencing Commission, June 2022, p. 14 (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220628_Status.pdf).

defendant who spent part of the eight years incarcerated serving a revocation sentence.

Even if the recidivism data relied upon by the Sentencing Commission was not flawed, it would not support a reduction in Cates's case. The Criminal Law Committee of the Judicial Conference of the United States, in opposing retroactive application of Amendment 821, observed that the Sentencing Commission's data established a statistically significant difference between the higher recidivism rates of status point defendants, like Cates, who had one to four criminal history points for prior sentences (before adding in status points) and the lower recidivism rates of non-status point defendants with one to four criminal history points.[9] This keen observation is particularly noteworthy because the Sentencing Commission's own research study of status points acknowledged that the difference was statistically significant and that such status point defendants are more likely to commit future crimes.[10]

A decision to apply Amendment 821 to retroactively reduce Cates's sentence, or any sentence for that matter, would also not be supported by other Sentencing Commission recidivism research that was published in recent years. The research confirms that longer prison sentences not only prevent more crimes prior to release,

---

[9] Public Comments of the Criminal Law Committee of the Judicial Conference of the United States Opposing the Retroactive Application of Amendment 821, p. 7 n.11 (https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202306/88FR28254_public-comment.pdf#page=9).

[10] "Revisiting Status Points," United States Sentencing Commission, June 2022, p. 14 (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220628_Status.pdf).

they deter more crimes after release.  This is consistent with logic and common sense.

In April 2020, the Sentencing Commission published its findings from studying 25,431 federal defendants who were released in 2005 following prison sentences or probation sentences. "Length of Incarceration and Recidivism," United States Sentencing Commission, April 2020, p. 5.[11]  The Sentencing Commission research "consistently found that incarceration lengths of more than 120 months had a deterrent effect." *Id*. at p. 4.  Defendants incarcerated for more than 120 months are between 30 and 45 percent less likely to recidivate within 8 years of release. *Id*.  Defendants incarcerated for more than 60 months were more likely to recidivate than defendants who received sentences of more than 120 months, but they were still 17 percent less likely to recidivate than defendants who received shorter sentences. *Id*.

In June 2022, the Sentencing Commission published its findings from similarly studying 32,135 federal defendants who were released in 2010 following prison sentences or probation sentences.[12] "Length of Incarceration and Recidivism," United States Sentencing Commission, June 2022, p. 5.  The Sentencing Commission described its findings relative to the 2010 federal defendants as "almost identical" to its findings relative to the 2005 federal

---

[11] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2020/20200429_Recidivism-SentLength.pdf

[12] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2022/20220621_Recidivsm-SentLength.pdf

defendants discussed above. *Id.* at 4. Sentences of more than 60 months in prison had a preventative effect and sentences of more than 120 months in prison had an even greater preventative effect. *Id*. "The odds of recidivism were approximately 29 percent lower for federal offenders sentenced to more than 120 months incarceration. . . ." *Id*. "The odds of recidivism were approximately 18 percent lower for offenders sentenced to more than 60 months up to 120 months incarceration. . . ." *Id*.

Even if the decision to apply Amendment 821 retroactively was supported by recidivism research, the decision would still be flawed. Regardless of whether adding two status points in a criminal history calculation predicts future recidivism, it justifiably accounts for existing recidivism. Amendment 821's reliance on future recidivism places excessive focus on the next crime a status point defendant may commit instead of on the crimes he already committed – i.e., the crime for which he is to be sentenced and the crime for which he was serving a sentence when he committed yet another crime. As the Criminal Law Committee of the Judicial Conference of the United States stated in opposing retroactive application of Amendment 821, "the amendment appears to focus on specific deterrence rather than other important statutory sentencing goals, such as promoting respect for the law, the seriousness of the offense, culpability, just punishment, or general deterrence."[13]

---

[13] Public Comments of the Criminal Law Committee of the Judicial Conference of the United States Opposing the Retroactive Application of Amendment 821, p. 7 (https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202306/88FR28254_public-comment.pdf#page=9).

Finally, as noted above, the Sentencing Guideline system was created by Congress to achieve truth in sentencing. U.S.S.G., Chapter 1, Part A, "Introduction and Authority." The Sentencing Commission then acknowledged, in developing the Sentencing Guidelines, that sentence reductions produce "confusion and implicit deception." *Id*. When the Sentencing Guideline system was first developed, it was the Parole Commission that was required to make decisions that created "confusion and implicit deception" by determining "how much of [a] sentence an offender actually would serve in prison." *Id*. Through the decision to retroactively apply Amendment 821, the Sentencing Commission has now required district courts to act as *de facto* parole commissions in addition to performing all of their other important functions.

Retroactive sentence reductions erode truth and finality in sentencing regardless of whether the decisions are made by commissions or courts. They should be rare and justified by clearly compelling circumstances. For the reasons stated above, the general decision to apply Amendment 821 retroactively was not supported by compelling circumstances. For the reasons stated below, a specific decision to apply Amendment 821 to reduce Cates's sentence would likewise not be supported by compelling circumstances. Compelling circumstances, in fact, fully justify requiring him to actually serve the sentence originally imposed.

### III. REDUCTION NOT JUSTIFIED

On April 13, 2009, M.L. reported to the Erie Police Department that her fourteen-year-old daughter had been missing since the evening of April 12,

10

2009. She indicated that her daughter may have departed Erie to meet with Cates, who was a resident of Montana. M.L. was aware that her daughter had a long-term relationship with Cates over the past few years. M.L. explained that she and her husband had phone contact on several prior occasions with Sarah Cates, the defendant's mother, who also lived in Montana. During a conversation with Mrs. Cates on April 13, 2009, M.L. learned that the defendant was actually twenty-one years old instead of seventeen, as she had thought. During that same conversation, Mrs. Cates inquired about the minor victim's whereabouts, and she informed M.L. that she believed that the defendant was enroute to Erie to get the victim. Mrs. Cates informed M.L. that she had not seen the defendant since April 10, 2009, and Mrs. Cates asked M.L. not to contact law enforcement until Mrs. Cates had an opportunity to contact an attorney. A subsequent search for the minor victim revealed the following information.

On April 12, 2009, Cates, who was then twenty-one, arrived in Erie, Pennsylvania, from Montana to pick up the minor female victim, with whom Cates had been corresponding via the Internet and telephone since in or around February 2007. The two had spoken extensively about Cates coming to get the minor victim, and they had even agreed upon a code word which would signify that Cates had departed Montana for Erie. Records reflected that Cates had informed the minor victim of his plans to become a fugitive from Montana charges involving the alleged rape of several other minor females.

11

Shortly after Cates's arrival in Erie on April 12, 2009, he and the minor victim went behind a local Walmart and engaged in several sex acts. They subsequently hitchhiked to Clarksville, Arkansas, where they were eventually apprehended on April 16, 2009. The minor victim was interviewed upon their arrest and at a later date, during which time she admitted that she and Cates also had sex numerous times while hitchhiking from Erie. Their final destination was either Seattle, Washington, or Portland, Oregon.

When interviewed by authorities, the minor victim stated that she met Cates online on February 14, 2007, at which time she was twelve years old, and Cates was nineteen. In August 2007, the two began "dating" online. She further revealed that she and Cates often exchanged naked pictures of themselves and had engaged in phone- or cyber-sex. She stated that Cates would suggest different poses or acts which he wanted her to perform. A subsequent forensic examination of the minor victim's family computer and the minor victim's digital camera revealed at least two occasions when she had taken naked pictures of herself while engaged in sex acts. She estimated that Cates had sent her thirty naked images of himself and that she had sent him nearly twenty naked images of herself using computers or phones between 2007 and 2009. Investigators also recovered sex-related text discussions on the victim's phone which occurred between her and Cates just prior to Cates's departure from Montana in April 2009.

On April 8, 2009, the victim and Cates agreed that Cates would meet her

for the first time in Erie after which they would leave for their final destination on April 12, 2009. Cates told the victim that he was hitchhiking to Erie after his mother had driven him out of the state of Montana. Prior to meeting the defendant in Erie, the victim deleted, at Cates's direction, all of Cates's social media and email accounts, as well as all her own social media accounts. The victim told authorities that Cates had advised her to do so, and that Cates had given her his login and password information for that purpose. She confirmed that they engaged in sexual activity upon the defendant's arrival in Erie, and that the two had also engaged in vaginal, oral, and anal intercourse during their trip. She also indicated that during their travels, she had discarded her cell phone and the battery in separate locations because her "mom kept calling." Cates also discarded his cell phone.

Cates was also interviewed by the FBI following his apprehension in Arkansas, at which time he admitted that he traveled to Erie with the two-fold purpose of fleeing his pending charges in Montana and of taking the minor victim with him. Although he confirmed that he and the victim had previously exchanged naked pictures via computer and phone, he claimed that he eventually told her to stop sending said pictures of herself to him because he did not want her to get into legal trouble. The defendant was unwilling to discuss whether he had sex with the minor victim. Cates also admitted to instructing the victim to erase his online accounts. He also admitted telling the victim to discard her phone after they departed from Erie. Cates said that he had

13

discarded his own cell phone several hours after leaving Erie with the victim. He admitted that he knew they could be tracked through their phones.

Furthermore, after Cates's indictment and detention at the Erie County Prison in this case, a series of his recorded phone calls reflected that Cates's mother had orchestrated and facilitated phone contact between the minor victim and Cates on several occasions. During one such three-way conversation among the defendant, his mother and the victim, Cates and his mother expressed concern over the fact that the defendant's mother had forgotten to press "*67" prior to placing the call, which would have prohibited anyone from tracing the source of the phone call. Further investigation revealed that there was mail correspondence between Cates and the minor victim after his arrest, indictment, and detention, which prohibited such contact. Additionally, email and Facebook records confirmed that the defendant's mother had correspondence with the victim on several occasions, during which she advised the victim that she would mail her letters from the defendant. In another instance, Mrs. Cates asked the victim to provide a written statement about the instant offense with the objective of helping the defendant.

Cates was on probation when he committed the conduct giving rise to this federal prosecution. In November 2004, Cates was adjudicated delinquent in Idaho for Lewd Conduct with a Child Under Sixteen. Between July 13, 2004, and July 21, 2004, Cates, while age 16, on three separate occasions fondled and vaginally penetrated a seven-year-old girl with his fingers. Reports also reflect that he

14

forced the minor victim to perform oral sex on him and that he also "played with himself" in front of the child. Cates was released from juvenile probation in this matter on April 11, 2008, which was more than a year after he and the minor victim began communicating on social media.

When Cates traveled from Montana to Erie in April 2009, he also became a fugitive from a pending criminal case in Fergus County, Montana. In that case, Cates was charged with ten counts of Sexual Intercourse Without Consent and one count of Attempted Sexual Intercourse Without Consent. The charges in that case involved allegations that between April 2005 and September 2005, Cates raped or attempted to rape five minor females by engaging in vaginal and/or oral sex with them. The minors were between the ages of 14 and 16 years. This case appears to have been dismissed in 2013 because of Cates's sentence in this case.

Paragraphs 42 through 47 of Cates's PSIR also detail very disturbing aspects of Cates's longstanding serious mental health problems. His mental health issues include a psychiatric hospitalization in October 2003 after Cates claimed to have heard voices which he referred to as "the counsel" which instructed him to kill his parents and sister. (PSIR ¶ 43). As a result, Cates retrieved a knife and attacked his sister who was about 15 at the time. (PSIR ¶ 43). Moreover, a psychosexual evaluation conducted in October 2004 concluded that Cates "does not appear to have good impulse control regarding sexual urges." (PSIR ¶ 46). Cates's troubling mental health issues and lack of sexual impulse control weigh heavily against his early release from incarceration.

At the time of Cates's sentencing hearing in this case in October 2011, the Sentencing Guidelines recommended a sentence of between 210 and 262 months in prison. Judge Cohill imposed a sentence of 262 months at each of the three counts of conviction to be served concurrently to be followed by a life term of supervised release.

Cates had three criminal history points when he was sentenced, resulting in a criminal history category of II. Two of his criminal history points were status points recognizing the fact that he was on probation when he committed the child exploitation offenses in this district. If that distinguishing and significant fact had been ignored in the calculation of his criminal history category – as it would be through the retroactive application of Amendment 821 – his criminal history category would have been I and his guideline range would have been 188 to 235 months.

Cates's 262-month sentence was fully justified when it was imposed and still is now. Retroactively reducing his sentence now would fail to account for the significant difference between a defendant who commits a crime while serving a sentence for another crime and a defendant who was not serving a prior sentence.

The commission of a crime while serving a sentence for another crime, while too common, is not commonplace. It is a distinguishing fact that must be recognized in sentencing to prevent unjustified sentencing disparities or similarities for existing crimes, regardless of whether a particular defendant commits a future crime. In addition to the generation of truth in sentencing, Congress created the

Sentencing Guideline system to eliminate the disparate treatment of similar defendants and the similar treatment of disparate defendants. U.S.S.G., Chapter 1, Part A, "Introduction and Authority."  The application of Amendment 821 to retroactively reduce Cates's sentence would indulge the pretense that he was not serving a sentence for a prior crime when he committed the instant crime – even though he actually was, and other federal defendants actually were not when they committed their crimes.

Finally, Cates's institutional misconduct while serving his sentence, while not necessary to deny the pending motion, is a sufficient reason for doing so.  There are defendants who follow BOP rules and are rarely, if ever, sanctioned for violating those rules while serving their sentences.  Cates is not one of those defendants.

Cates's BOP disciplinary record is set forth below.  His disciplinary record includes a continuation of the very criminal conduct for which he is incarcerated, resulting in sanctions for contacting the minor victim via both phone and letter which in both instances involved sexual content.

```
    MCKC4          *         INMATE DISCIPLINE DATA          *      01-17-2024
 PAGE 001 OF 001 *       CHRONOLOGICAL DISCIPLINARY RECORD   *      11:49:14

 REGISTER NO: 09712-010 NAME..: CATES, DONALD RAY MAXW
 FUNCTION...: PRT       FORMAT: CHRONO    LIMIT TO ___ MOS PRIOR TO 01-17-2024

 ------------------------------------------------------------------------------
 REPORT NUMBER/STATUS.: 2325980 - SANCTIONED INCIDENT DATE/TIME: 07-05-2012 1445
 DHO HEARING DATE/TIME: 07-24-2012 1215
 FACL/CHAIRPERSON.....: TCP/V PETRICKA
 REPORT REMARKS.......: ADMITTED TO CONTACTING HIS MINOR VICTIM IN A LETTER CONT
                        AINING SEXUAL CONTENT
     197  PHONE ABUSE, CRIMINAL - FREQ: 1 RFP: D
          DIS GCT    / 41 DAYS / CS
          COMP:010 LAW:P
          DS         / 120 DAYS / CS
          COMP:    LAW:
          FF NVGCT   / 40 DAYS / CS
          COMP:010 LAW:P
          LP COMM    / 2 YEARS / CS
          COMP:    LAW:
          LP EMAIL   / 2 YEARS / CS
          COMP:    LAW:
          LP PHONE   / 2 YEARS / CS
          COMP:    LAW:
          MON FINE   / 300.00 DOLLARS / CS
          COMP:    LAW:    MF
 ------------------------------------------------------------------------------
 REPORT NUMBER/STATUS.: 2325981 - SANCTIONED INCIDENT DATE/TIME: 07-05-2012 1445
 DHO HEARING DATE/TIME: 07-24-2012 1200
 FACL/CHAIRPERSON.....: TCP/V PETRICKA
 APPEAL CASE NUMBER(S): 702165
 REPORT REMARKS.......: ADMITTED TO CONTACTING HIS MINOR VICTIM ON THE PHONE
                        ENGAGED IN PHONE SEX
     197  PHONE ABUSE, CRIMINAL - FREQ: 1 RFP: D
          DIS GCT    / 41 DAYS / CS
          COMP:010 LAW:P
          DS         / 120 DAYS / CS
          COMP:    LAW:
          FF NVGCT   / 40 DAYS / CS
          COMP:010 LAW:P
          LP EMAIL   / 2 YEARS / CS
          COMP:    LAW:
          LP PHONE   / 2 YEARS / CS
          COMP:    LAW:
          MON FINE   / 200.00 DOLLARS / CS
          COMP:    LAW:    MF
```

United States Probation has raised a concern regarding Cates's place of supervision when released.  Cates has no known tie to the Western District of Pennsylvania such that if he is released to this district soon, he will very likely be homeless and in need of homeless shelter type accommodations which may not be available to him.  Such a housing situation is very concerning given Cates's history of sexual violence and mental health issues.  United States Probation has also indicated that the District of Montana, Cates's home district and the district to which he most likely will want to return, is under no obligation to accept supervision responsibility for Cates.  Given his history, there is good reason to surmise that Montana will not accept supervision of Cates.

Cates's motion to reduce his sentence should be denied.  His 262-month sentence was fully justified when it was imposed and remains so justified.  His history of sexual violence against minors and significant mental health issues makes him a clear danger to society such that Judge Cohill imposed a sentence at the highest point of the guideline range.  At a minimum, there is no basis for a time served sentence to be imposed as that would be a sentence at the bottom of the new, retroactive guideline range which is inconsistent with Judge Cohill's intent and recognition of Cates's obvious dangerousness.  Cates has repeatedly sexually assaulted young girls, there is no reason to let Cates out early.  Doing so only endangers the community.

Respectfully submitted,

ERIC G. OLSHAN
United States Attorney


*s/Christian A. Trabold*
Christian A. Trabold
Assistant U.S. Attorney
PA ID No. 75013